IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO.   18-171 |
| SARAH NORTON | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Sarah Norton aggressively targeted and exploited a 14-year-old boy. She toyed with him for her own sick pleasure. Her extensive manipulation of the victim, compounded by her lies, resulted in the victim believing he was in a relationship with Norton. It was then that Norton traveled from her home in Connecticut to Pennsylvania to have sex with the victim. Norton has yet to appreciate the full deviance of her behavior and the harm she caused a child and his family. The appropriate sentence in this case is at the top of the guideline range of 151 to 188 months.

**I.    PROCEDURAL BACKGROUND**

On April 26, 2018, defendant Sarah Norton was charged by indictment with two counts: Count One, attempted enticement of a minor, in violation of Title 18, United States Code, Section 2422(b), and Count Two, travel to engage in illicit sexual conduct with a minor, in violation of Title 18, United States Code, Section 2423(b). Trial commenced on December 9, 2019 and concluded on December 11, 2019 with a conviction on both counts. Sentencing is scheduled for November 23, 2020.

## II.     FACTUAL BACKGROUND:

Defendant Norton's crimes came to the attention of the Upper Macungie Police Department through a 14-year-old boy's father and stepmother when they discovered their son had been communicating with a woman whom they believed was 25 years old. They gave consent for law enforcement to examine electronic devices used by their son, including a PlayStation gaming console and a mobile telephone. Through these devices and further investigative work, law enforcement was able to identify the woman the victim had been communicating with as defendant Sarah Norton, a 38-year-old mother of three who lived in Connecticut.

Norton met the victim while playing the same game on the Internet connected gaming console PlayStation. She targeted this 14-year old boy and enticed him to chat privately with her in or around August 2017. Norton knew from the beginning that the victim was only 14 years old. Norton lied about her age so that the child would communicate with her, telling him that she was 25 years old. Norton groomed this child for a sexual relationship from the very start of their communications. She flirted with this boy, telling him that a relationship with the victim would be wrong and he should look her up in a few years. Despite her empty statements, she continued to communicate with the victim and progressively and aggressively turned her attention to sexually charged and explicit communications. Norton stated she wanted to travel to meet the victim in Pennsylvania to have sexual contact with him and got angry when the victim did not initially react in the way she expected.

Some of the recovered communications between Norton and the victim included:

**Norton:**      **Baby u have no idea what is in store u.   Thank go ur young and will be able get it back up for me quick cause u are gonna cum real fast.**

Minor:        Good I'll be ready (smiley face)

2

| | |
|---|---|
| **Norton:** | **Just try to forgive me after i get done with u.   Especially the 1st time we do it.   Cause i am sexually frustrated cause of u.     And ur a virgin and I am gonna tear that dick up.** |
| Minor: | Don't worry i will be ready for it (smiley face with tongue out) |
| **Norton:** | **I tried to tell you i was dead serious.   My pussy physically hurts cause i want u inside me that bad.   Its horrible for me.** |
| Minor: | Wow now i feel so bad for u. |

Other exchanges included:

| | |
|---|---|
| **Norton:** | **U know i want to come see u right?   So please don't encourage me.** |
| Minor: | I'm not going to but i want to see you to its not fair. |

_____

| | |
|---|---|
| **Norton:** | **So if I come out there, any issues with me stealing u away?   I don't want to get u in trouble.** |
| Minor: | I don't care, I already said. |
| **Norton:** | **I do!! I wold rather be able to talk to u all the time rather than seeing u once and then we cant talk no more.   I would die.** |
| Minor: | Me too |
| **Norton:** | **Honestly, do u have parental supervision where ever u go?** |
| **Norton:** | **Play the game so we can talk** |

Over time, the Norton's communications with the child took a twisted turn. She began berating him for not paying enough attention to her, and for not being an equal partner in their "relationship."  Her constant barrage of messages to the child catapulted him even further into an adult "relationship," way beyond his level of maturity, experience, and understanding.   In so doing, she interrupted and forever destroyed the child's normal pace of development, maturity,

3

and sexuality.

| | |
|---|---|
| **Norton:** | **I am kinda disappointed with you.  I wanted to see u.** |
| Minor: | I know |
| Minor: | R U upset (sad face) |
| **Norton:** | **I am not gonna allow myself to get there.  I told u b4, I knew u were fucking with my head, and I chose to listen to u again.  Fool me once.** |
| Minor: | Shame on me |
| **Norton:** | **Exactly** |
| **Norton:** | **U got me twice, so its on me now.** |
| **Norton:** | **Did u think I wouldn't see ur new "changes?" nice touch, So really, fuck u sam.** |
| Minor: | I did not change, And u to, LOL.  R u going back on or no. |
| **Norton:** | **Like really?  1st us wanna see me then u don't, then u change the group name.  Apparently u have.  Am I playing rebound 4 u?  Actually, I don't wanna know, I already know.** |
| Minor: | I want to see u |
| **Norton:** | **Seriously, whats going on.** |

(Several messages exchanged with Norton accusing Minor of liking someone else.)

| | |
|---|---|
| Minor: | There is nothing going on I telling u the truth. |
| Minor: | Plz know that I am telling u the truth |
| **Norton:** | **I don't know.  I was gonna drive 8 hrs to visti u and u r acting like u cant be bothered. I am tired of throwing myself at u.  There is only so much rejection I can take from one person.** |
| Minor: | Im no rejecting u at all if you want to u can. |
| Minor: | I never do anything in the weekends so u can. |

4

| | |
|---|---|
| **Norton:** | **Since u acted like u didn't want to see me, I made other plans. That's why I was trying to make lock something down with u. But seriously, its getting old. I cant put myself out ther no more.** |
| **Norton:** | **I never ever through myself at anybody, and ur tossing me to the side. I cant do it.** |
| Minor: | Plz do I really really really want to see u so badly u will make me happier than I am and im not tossing u to the side. |
| **Norton:** | **I don't know now. I wouldn't be able to get out there till late and I know u cant sleep out. I might try again next month. By the way its going. I doubt it.** |
| Minor: | Ok (sad face) |
| **Norton:** | **Its really ironic how u actually show enthusium after the fact. U know that had u acted this way earlier, I would be on my way out there in a couple of hours. But I think its just an act with u.** |
| Minor: | Its not |
| **Norton:** | **so why bullshit me earlier about wanting to see me** |
| **Norton:** | **But I don't want to get im trouble. Expecially if u think u will get caught. I just don't know if u could do this without getting in trouble.** |
| Minor: | I said to go to park and then u can take me anywhere. |
| **Norton:** | **But I wont be able to get out there till 9 and that's late for u** |
| Minor: | Then really early in the morning |
| **Norton:** | **Ok. How early? And will I really be able to take u awar from the park?** |
| Minor: | Not for the day but for until what my mom would say for what time, ow long does it take for us to get to where I live |

Communications followed discussing how long it would take for Norton to get to Pennsylvania, her plans to check into a hotel, and that if the victim was lonely, she would be only five minutes away and he can keep her warm in bed. Then the following exchange took place:

5

| | |
|---|---|
| **Norton:** | **Really, like I teased u druign my peak hours?   I think u like it** |
| Minor: | I did I like it a lot |
| **Norton:** | **Well, I am trying to get there during those hours in case u wanna see for urself** |
| Minor: | Remember to go to the park and plz yes |
| **Norton:** | **I sill but how am I gonn get a hold of u that late?** |
| Minor: | I know I wish I had my phone now. |
| **Norton:** | **Well figure it out.   I gotta go.   I am running late.   I want u bad so please figure it out.   I will let u know when I am on the road.** |

On October 14, 2017, Norton traveled from her home in Connecticut to Pennsylvania and checked into the Super 8 Hotel Allentown West. She met the victim in a park the next morning.

Norton admitted to law enforcement she was in communication with the victim and that she knew he was only 14 years old.   She said she developed feelings for him.   She also admitted to telling the victim she was only 25 years old and that she did engage in sexual communications with the victim.   She admitted she drove from Connecticut to Pennsylvania to be with the victim sexually but claimed she changed her mind when she saw him, stating she "realized the relationship was wrong."   At trial, she testified that she met the victim in the park on October 15, realized it was wrong, and had no intentions of seeing him again that day. The evidence adduced at trial showed these self-serving claims to be lies. A court order was obtained for Norton's phone records including cell site information. The cell site records establish that Norton traveled on October 14 and 15, round trip from Connecticut to Pennsylvania. The travel records are consistent with her traveling from her home in Connecticut to the Super 8 in Pennsylvania on October 14 and returning to Connecticut late afternoon on October 15.   More significantly, the records document that

6

Norton met the victim in the park in the morning, but then the victim had to leave for a family lunch. She was expecting to meet him at the park again after lunch. She returned to the park and waited for him to reappear. It was during this lunch period that the victim's father and stepmother realized what was going on and refused to allow the victim back to the park. Regardless, Norton stayed waiting at the park and sent text messages to the victim trying to make contact.

It was not until Norton received a voicemail from the victim's stepmother warning her to stay away from her 14-year-old stepson, that Norton finally gave up and started her travel back to Connecticut.  Norton's claim, which included her trial testimony, that as soon as she saw the victim in the morning, she realized it was wrong and that she headed back home, is belied by her own cell phone records including GPS data and her text messages. Regardless, the crime was already committed when she drove into Pennsylvania with the intent to have sexual relations with a minor.

### III.     SENTENCING CALCULATION.

#### A.     Statutory Maximum Sentence.

Count One:   Lifetime imprisonment, a mandatory minimum 10 years' imprisonment, a $250,000 fine, a mandatory minimum five years' supervised release up to lifetime supervised release, a $100 special assessment, and if found not to be indigent an additional mandatory $5,000 special assessment pursuant to 18 U.S.C. § 3014.

Count Two:   30 years' imprisonment, a mandatory minimum five years' supervised release up to lifetime supervised release, a $250,000 fine, a $100 special assessment, and if found not to be indigent, an additional mandatory $5,000 special assessment pursuant to 18 U.S.C. § 3014.

**Total Maximum and Mandatory Minimum Punishment**:  Lifetime imprisonment, a mandatory minimum 10 years' imprisonment, a $500,000 fine, a mandatory minimum five years' supervised release up to lifetime supervised release, and $10,200 in special assessments.

### B.   Sentencing Guidelines Calculation.

The Probation Office correctly calculated the defendant's advisory guideline range as follows:

| | |
|---|---|
| Base Offense Level – USSG § 2G1.3(a)(3): | 28 |
| Misrepresentation – USSG § 2G1.3(b)(2)(A): | +2 |
| Use of a computer USSG § 2G1.3(b)(3)(A): | +2 |
| Materially false statement USSG § 3C1.1 | +2 |
| Adjusted Offense Level: | 34 |
| **Resulting Guideline Range:** | **151-188** |

The defendant challenges the USSG § 3C1.1 enhancement of two levels in PSR ¶ 36 for making a materially false statement during her trial testimony. This enhancement is applicable and warranted. As stated in the PSR, the defendant claimed she did not have any sexual motivation in meeting the victim. PSR ¶ 36. Trial evidence clearly refutes this claim. Furthermore, Norton testified that she did not go back to the park to wait for the victim after he had to meet his parents for lunch. This is a blatant lie. Her mobile telephone GPS records place her in the park at the same time she is texting the victim to figure out where he was.  Because she lied, under oath, and that lie was material, the enhancement is warranted.

Section 3C1.1, the guideline for obstruction of justice, provides in pertinent part:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or

8

Case 5:18-cr-00171-JFL Document 76 Filed 11/16/20 Page 9 of 16

> sentencing or the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

Perjurious testimony by a defendant at trial can constitute an obstruction of justice. U.S.S.G. § 3C1.1 appl. note 3(b); United *States v. Dunnigan*, 507 U.S. 87 (1993).

In addition, Application notes 4(b) and (f) of Section 3C1.1 state that an obstruction enhancement is warranted for "committing, suborning, or attempting to suborn perjury" and for "providing materially false information to a judge or magistrate." *See Dunnigan, supra*. (holding that the enhancement does not violate a defendant's right to testify and is properly applied where the defendant commits perjury).

The court must make findings to support all the elements of a perjury violation in the specific case, i.e., factual findings that the defendant gave false testimony concerning a material matter with the willful intent to provide false testimony. *Dunnigan*, 507 U.S. at 94, 97. However, express findings are not required where ""the record establishes that the district court's application of the enhancement necessarily includes a finding as to the elements of perjury and those findings are supported by the record.'' *United States v. Fiorelli*, 133 F.3d 218, 221 (3d Cir. 1998), *quoting United States v. Boggi*, 74 F.3d 470, 479 (3d Cir. 1996).

This Court need find obstruction only by a preponderance of the evidence. *Fiorelli,* 33 F.3d at 222 n.3. If the Court determines that the defendant has obstructed justice, or attempted to do so, the two-level enhancement is mandatory. *United States v. Williamson*, 154 F.3d 504, 505 (3d Cir. 1998).

At stated, at trial Norton testified that she did not have any intent to have sexual contact with the victim and that she never went back to the park to wait for the victim. The evidence and

9

jury verdict clearly show both statements were perjured testimony. Indeed, the jury could not have convicted Norton without rejecting her testimony regarding her claims of not having criminal intent and her testimony about not going back to the park was refuted by her own mobile telephone records and text messages. *See United States v. Johnson*, 302 F.3d 139 (3d Cir. 2002) (affirming imposition of obstruction of justice enhancement based on defendant's perjurious testimony).

In *Johnson*, the defendant testified that the coat he was wearing when he was arrested, which later was found to conceal ""crack'' cocaine, and a " "drug-laden'' bag found at the residence where he was staying, did not belong to him. *Id*. at 153. A cooperating witness testified expressly to the contrary. *Id*. This Court held that, by virtue of its verdict, the jury credited the cooperating witness and rejected the defendant's testimony. Moreover, the sentencing court was bound by the factual determinations implicit in the jury's verdict. *Id.* Accordingly, "[b]ecause several portions of [the defendant's] sworn testimony at trial were irreconcilably inconsistent with the jury's verdict," this court found that imposing a Section 3C1.1 enhancement was not clearly erroneous. *Id*. As in *Johnson*, Norton's testimony that she had no intent to sexually abuse a child, and never went back to the park are irreconcilably inconsistent with the jury's guilty verdict. The obstruction of justice enhancement is therefore proper.

IV.     **SENTENCING ANALYSIS**

A thorough consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that the most appropriate sentence is one at the top of her Guideline range of 151 to 188 months' imprisonment.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v.*

*United States*, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.   18 U.S.C. § 3553(a).

### A.     Nature and Circumstance of the Offense:

Sarah Norton consciously and deliberately manipulated and sexually exploited a 14-year-old boy. Her behavior was predatory, narcissistic, manipulative, and aggressive. She directly caused harm to the victim and his family. As a mother herself, she knew the damage she was causing and simply did not care. At the time of her crimes, she had a son the exact same age as her victim. Yet, her communications demonstrated she wanted to ensure she could sneak the victim away from his parents without getting caught, and clearly without their knowledge. The communications demonstrate how Norton was taking advantage of a naïve, immature child.

11

Anytime she believed the victim may be pulling away from her, or not showing her the attention she craved, she engaged in manipulative tactics to get him to respond affirmatively to her. The victim was looking for companionship and friendship. Knowing this, Norton represented herself as younger, just 25, and pushed herself into his heart by pretending to care, all the while having sexually deviant motives.

Norton is directly responsible for launching the victim into an adult status; one he was not ready for and which did not occur at a natural pace and in a natural way. Even as Norton's crimes were being investigated and prepped for trial, the child was distraught, did not want to testify, and in fact, did not do so.   He has had a difficult time recovering from the manipulation and sexual advances perpetrated by Norton, all part of her deviant ruse. Norton took a boy who was barely a teenager and who had his own emotional struggles and used that knowledge to attempt to create a bond in a sick, twisted way. The effects of what she has done cannot fully be known. What we do know is she has forever single-handedly negatively impacted a child's life and left resounding scars that will last a lifetime.

      B.     **History and Characteristics of Defendant**:

While Norton does not have any criminal history, her actions in this case did not occur simply on one day and are not an isolated incident. Her criminal behavior was drawn out over months and executed to deceive the child victim and the victim's family. Norton would communicate with the victim at all hours of the day and night. She was relentless in her pursuit of the child and was sometimes coy in the way she went about it. She stayed "in character" as a 25-year-old, unattached women. She had every minute of every day while her criminal behavior progressed to realize her behavior was not only wrong, but disturbed, harmful, and illegal, and

simply stop. Not only did she not do so, but her behavior escalated, became more sexually aggressive, and resulted in her traveling from her home in Connecticut, leaving her own children behind, to travel to Pennsylvania with the express intent of sexually abusing a 14 year old boy.

As stated, Norton has three children of her own, one a boy, the exact same age as her victim. She all but forgot about her children while engaged in her relentless pursuit of the victim. She left her children behind overnight while she traveled from her home in Connecticut to have sex with the minor in Pennsylvania. She did this to satisfy her own twisted and deviant desires. Despite a mother and brother who care for her, a significant other, three children, a stable residence, and full-time employment, she was still not deterred from pursuing her sexual deviant motives with a child. As a result of this, in addition to her sentence of imprisonment, the government submits a supervised release period of 20 years is appropriate.

Norton had the opportunity to accept responsibility and she chose not to do so. She had the right to take the case to trial, but now that she has, she must face the consequences. She continues to deny her evil intentions. This speaks volumes about her character. Not only did she take the case to trial, and felt compelled to insist what she has done was not morally, ethically, and legally wrong, but then she perjured herself by denying her obvious intent and claiming she never went back to the park to once again attempt to have sex with the victim. When faced with an opportunity to tell the truth, to spare the victim and his family, she chose to lie. She must face the consequences of those actions, and that is a sentence at the top of the guideline range.

**C. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**:

To say Norton's offenses are serious is an egregious understatement. She created suffering and conflict with a 14-year-old boy and with his family. The fact that she still maintains her

13

innocent motives in communicating with the victim and traveling hours to see him, despite the overwhelming evidence of her guilt, does not bode well for her and demonstrates her lack of acknowledgment of the seriousness of her criminal actions. She has not shown a shred of respect for the law. A sentence at the top of the guidelines is needed to reflect the seriousness of her offense, to promote respect for the law, and indeed to provide just punishment for the offense.

**D.    The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant;**

Norton's behavior must be deterred. The online world can be a truly terrifying place for children. In this case, the victim was looking for a friend, maybe a girlfriend, someone to simply communicate with, who liked him for who he was. Norton exploited these vulnerabilities, lied to him, and preyed on his innocence. Norton took a teenage boy, who was already having problems finding his place in the world and made his life significantly more challenging. She did this while professing to be trying to help him. Her kind of help included telling a troubled boy that her "pussy physically hurts cause [she] want[ed] [the victim] inside [her] that bad" and she was glad he was "a virgin" and she was going to "tear [his] dick up."    This kind of predatory destructive behavior must be deterred.

**E.    The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner**

There is no need to adjust a sentence based on any education or vocational treatment or for medical care.   In fact, any such issues can be addressed during the long term of supervised release that is required for these crimes.

F. **The guidelines and policy statements issued by the Sentencing Commission**

As stated above, the Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses. A sentence at the top of the defendant's 151 to 188 month guideline range has been earned.

V. **CONCLUSION**

Norton played mind games, manipulated, deceived, and exploited a 14-year-old boy. Her actions were reprehensible, and she has earned a sentence at the high end of the sentencing guideline range of 151-188 months.

Respectfully submitted,

WILLIAM M. MCSWAIN
United States Attorney


   /s/ Sherri A. Stephan
Sherri A. Stephan
Assistant United States Attorney

Dated: November 16, 2020.

## **CERTIFICATE OF SERVICE**

I certify that a copy of this sentencing memorandum was caused to be served by Sherri A. Stephan, Assistant United States Attorney, by electronic filing to defense counsel:

>David Jay Glassman
>1500 Market Street, 12th Floor
>Philadelphia, PA 19102
>davidjayglassman@gmail.com


    /s/ Sherri A. Stephan
Sherri A. Stephan
Assistant United States Attorney


Date: November 16, 2020