IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | 18-CR-171-1 |
| Plaintiff | : | |
| | : | Edward N. Cahn Courthouse |
| vs. | : | Allentown, Pennsylvania |
| | : | January 27, 2021 |
| | : | |
| SARAH NORTON | : | |
| | : | |
| Defendant | : | SENTENCING HEARING |

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

- - -

BEFORE THE HONORABLE JOSEPH F. LEESON, JR.
UNITED STATES DISTRICT COURT JUDGE

- - -

APPEARANCES:

For the Government:     SHERRI A. STEPHAN, ESQUIRE
                       UNITED STATES ATTORNEY'S OFFICE
                       615 Chestnut Street, Suite 1250
                       Philadelphia, Pennsylvania  19106


For the Defendant:     DAVID JAY GLASSMAN, ESQUIRE
                       1500 Market Street
                       12th Floor, East Tower
                       Philadelphia, Pennsylvania  19102




- - -

Deputy Clerk/
ESR Operator:          Justin Wood

TRANSCRIBED BY:        Drummond Transcription Service
                       Haddon Heights, New Jersey  08035

    Proceedings recorded by electronic sound recording,
transcript produced by computer-aided transcription
service.

1          (At 2:05 p.m. in Courtroom Altn. 3B.)

2          DEPUTY CLERK:  Oyez, oyez, oyez, all matter and

3  persons having anything to do before the United States District

4  Court for the Eastern District of Pennsylvania, which has been

5  in continuous session since November 10th, 1789 and which is here

6  held on this day, let them come forward and they shall be heard.

7  God save the United States and this Honorable Court.

8          Court is now in session in the matter of the <u>USA</u>

9  <u>versus Sarah Norton</u>, Criminal Action No. 18-171.

10         THE COURT:  We are here today for a sentencing

11  hearing, Mr. Wood, would you administer the oath to the

12  defendant, please?

13         DEPUTY CLERK:  Ms. Norton, please raise you right

14  hand.

15         SARAH NORTON, DEFENDANT, SWORN.

16         THE DEFENDANT:  I do.

17         DEPUTY CLERK:  Thank you.

18         THE COURT:  Ms. Norton, do you understand that you are

19  now under oath and if you answer any of my questions falsely,

20  your answers may later be used against you in another

21  prosecution for perjury or for making false statements, do you

22  understand that?

23         THE DEFENDANT:  I understand.

24         THE COURT:  If I say anything that you do not

25  understand, I want you to interrupt me and ask me to explain it

1  and I'll be happy to do so.

2        You may consult with your lawyer at any time during

3  the proceedings and I will take a break, so you can do so,

4  privately, if you wish.

5        In light of the ongoing nature of the COVID 19

6  pandemic, I am going to request that, the lawyers and the

7  defendant and all of the people in the courtroom, follow certain

8  guidelines today.

9        First, please do not touch the microphones, as we are

10  trying to limit the number of touch points in the courtroom.

11        Second, as best you can, please, maintain a six-foot

12  distance from one another.

13        Third, everyone should keep their face masks on at all

14  times during the hearing.

15        Please speak clearly, so there are no issues with the

16  audio recording.

17        If at any time, you cannot understand or hear me,

18  please let me know, so I can speak louder and more clearer.

19        And lastly, everyone should remain seated in their

20  seats at all times.

21        I am going to ask the lawyers, initially, if you would

22  consent to these -- following these guidelines?

23        MS. STEPHAN:  Yes, your Honor.

24        MR. GLASSMAN:  Yes, your Honor.

25        THE COURT:  All right.

1          And Ms. Norton, do you consent to the guidelines?

2          THE DEFENDANT:  Yes.

3          THE COURT:  All right.

4          Before we would proceed, Counsel, are there any other

5     matters, you would want to call to my attention about COVID 19,

6     before we would proceed?

7          MS. STEPHAN:  No, your Honor.

8          MR. GLASSMAN:  No, your Honor.

9          THE COURT:  All right.

10          For the record, Ms. Stephan, are there any victims of

11     the offenses present in the courtroom?

12          MS. STEPHAN:  No, there are not.

13          THE COURT:  And for the record, has the Government

14     fulfilled its duty to notify any victims of the hearing and

15     their right to attend?

16          MS. STEPHAN:  Yes, we -- we have, your Honor.

17          THE COURT:  All right.

18          And you may remain seated.

19          MS. STEPHAN:  Thank you.

20          THE COURT:  On April 26th of 2018, an indictment was

21     filed charging the defendant with the following:

22          Enticement of a minor to engage in illicit sexual

23     conduct in violation of Title 18 United States Code, Section

24     2422(b).  And travel to engage in illicit sexual conduct with a

25     minor in violation of Title 18 United States Code, Section

1    2423(b).

2          After a three-day jury trial in December of 2019, the

3    defendant was found guilty on all charges.

4          I've read and reviewed the presentence report prepared

5    by Leslie Maxwell dated February 29 of 2020 and revised on March

6    16th of 2020.

7          I have also received and reviewed the following:

8          From the Government, a sentencing memorandum dated

9    November 16th, 2020.  And a victim impact statement from the

10   minor victim's father.

11         And from the defendant, I have received and reviewed a

12   sentencing memorandum dated November 16 of 2020.  Information on

13   medullary sponge kidney.  And a total of eight letters in

14   support of the defendant received by us friends and family.

15         Counsel, any other letters or documents for submission

16   to the Court today?

17         MS. STEPHAN:  No, your Honor.

18         MR. GLASSMAN:  No, your Honor.

19         THE COURT:  All right.

20         Mr. Glassman, for the record, have you and your client

21   read and discussed the presentence report?

22         MR. GLASSMAN:  The presentence report was reviewed by

23   myself as well as my client, yes.

24         THE COURT:  All right.

25         And Ms. Norton, you've reviewed the presentence report

1    with your lawyer, correct?

2               THE DEFENDANT:  I reviewed it by myself, yes.

3               THE COURT:  And did you review it with your lawyer?

4               THE DEFENDANT:  No.

5               THE COURT:  All right.

6               Would you like any time to do that today?

7               THE DEFENDANT:  Ah, I -- I don't really know, how this

8    goes, ah, I just --

9               THE COURT:  All right.

10              Why don't we do this, why don't we take just a short

11   break for you to talk privately with Mr. Glassman, just to make

12   sure that if there is any questions or any issues, that you can

13   talk privately with him.  And if there are none, that's fine,

14   too --

15              THE DEFENDANT:  Okay.

16              THE COURT: -- but I want to give you that opportunity.

17              THE DEFENDANT:  Thank you.

18              THE COURT:  All right.

19              Nick and Dawn, where is the best place for the two of

20   them to confer -- Ms. Norton and her lawyer, privately -- would

21   it be in the quarters adjacent here?

22              UNIDENTIFIED SPEAKER:  They can do that back in the

23   cell.

24              THE COURT:  All right.

25              Why don't we have the two of you go back in the cell.

1        And Mr. Glassman, let us know when you would like to

2   reconvene.

3        MR. GLASSMAN:  Sure, okay.

4        THE COURT:  All right.

5        Mr. Wood, would you declare a brief recess?

6        DEPUTY CLERK:  Court is in recess.

7        (Recess is held at 2:10 p.m.)

8        (At 2:23 p.m. in open court.)

9        THE DEFENDANT:  Thank you.

10        THE COURT:  All right.

11        Mr. Wood, everyone has returned to the court, would

12   you reopen court, please?

13        DEPUTY CLERK:  Court is again in session.

14        THE COURT:  All right.

15        We had an off-the-record -- there was an off-the-

16   record private meeting between the defendant, Ms. Norton and her

17   attorney and they have now returned to the courtroom, so, we

18   will resume the hearing.

19        Ms. Norton, getting back to the questions, we were --

20   we were asking.

21        Have you now had a chance to review the presentence

22   report with your lawyer?

23        THE DEFENDANT:  Yes.

24        THE COURT:  And has your lawyer answered all of your

25   questions about the report?

1          THE DEFENDANT:  Yes.

2          THE COURT:  And are you satisfied with your lawyer's

3   representation of you?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Although there were no formal objections

6   to the presentence report that were raised with the Probation

7   officer, the Court will consider the defendant's objections that

8   were presented in the sentencing memorandum.

9          The defendant has raised two objections, the first,

10  the defendant objections to the two-level enhancement under

11  Section 2G1.3B2A, for misrepresenting her age to the minor

12  victim to entice the minor to engage in or continue the

13  prohibited sexual conduct.

14         Second, the defendant objects to the two-level

15  enhancement, pursuant to Section 3C1.1 for obstruction of

16  justice for making a materially-false statement during her trial

17  testimony.

18         I have reviewed those submissions that have been

19  received from counsel on these matters and if they would wish to

20  present any argument, I am willing to hear it now.

21         Mr. Glassman, anything else you'd want to present on

22  this -- either of these -- issues?

23         MR. GLASSMAN:  Judge, the cornerstone of both of those

24  arguments are -- and remain -- the defendant's position that she

25  did not travel across state lines for the purposes of engaging

1 in sex with the minor.

2       Beyond that statement, the defendant did cooperate

3 with the authorities.  She gave a statement when she was asked

4 to do so.  She exercised her right to proceed to trial, which

5 she had the right to do.

6       The jury's determination, was based on the evidence

7 that was presented during the course of the trial.  What it

8 wasn't based on and what couldn't be presented during the course

9 of the trial, is Ms. Norton's state of mind, when she engaged in

10 the conduct for which she is going to be sentenced for.

11       What I mean by that is, it's the jury's call with

12 regard to her state of mind and whether or not, traveled across

13 state lines for that purpose.  Obviously, they made that

14 determination with the -- with what tools they had and did the

15 best that they could.  Ms. Norton still maintains that that is

16 the facts.

17       And having said that, to call proceeding to trial, she

18 obstructed justice, really, is at odds with, I think, what her

19 constitutional rights are.  And it's not as if she exercised

20 that right in the face of an answer to the question of whether

21 or not, Ms. Norton is telling the truth, when she decided to

22 travel across state lines.

23       The jury's determination of the truth, is -- is as

24 good as we'd have to work with, but I think, there is a bigger

25 issue at -- at stake.

1      So, that -- that would be my position with regard to

2  the obstruction.

3      With regard to the age scenario, I think during the

4  course of the byplay with -- with the minor, the age issue was

5  minimized to the point where it didn't have an impact on any of

6  the proceedings.  In other words, I don't think that was an

7  issues here.  And I think, there are enough facts with regard to

8  what transpired between these individuals, that the age

9  manipulation at one point, sort of evaporated.

10      THE COURT:  All right, thank you.

11      Let's turn to the Government, Ms. Stephen.

12      MS. STEPHAN:  Thank you, your Honor.

13      First, I'll start with age, I think, it's crystal-

14  clear and Ms. Norton did not deny it when she testified, that

15  she told the victim, she was twenty-five-years old.  To say that

16  that's not a significant fact in this case to me, is -- it

17  totally defies the evidence in this case.

18      She was targeting a fourteen-year-old boy, had she

19  told the fourteen-year-old boy she was a thirty-eight-year-old

20  mar -- ah, mother of three, who was in a relationship, she would

21  have been less likely to succeed in her crime.  She told the boy

22  that she was twenty-five-years old.  She didn't represent that

23  she was engaged in any kind of relationship, whatsoever.  She

24  did that, so that the boy would communicate with her, so that

25  she could then go on to commit her crime.

1        Had she said, she was thirty-eight-years old, we may

2   not be sitting here today, your Honor.  So, the fact -- and she

3   admits, she told him she was twenty-five -- significantly

4   effects this case.  She did misrepresent her identity, she did

5   her age and I think, the enhancement is appropriate on that

6   fact.

7        As far as the second one, your Honor, the enhancement

8   for obstruction of justice, I also think that applies clearly

9   here.

10       I think there were numerous occasions where she

11  perjured herself at trial.  I should point out first, that just

12  because she is a defendant on trial and chooses to testify, she

13  takes the oath like anybody else takes, she is obligated to tell

14  the truth, that is the cornerstone of our entire system, the

15  witnesses, who get on the stand are expected to tell the truth.

16       And that does not go away just because she is the

17  defendant in this case.  She did not have to testify, but she

18  choose to do so.

19       In doing so, she made several perjurist statements

20  that were completely belied by the evidence.  I will focus on

21  two for the purpose of this argument.

22       The first is, that she said -- and it has been

23  repeated here -- she had no intent when crossing state lines to

24  have sexual contact with the minor, she testified to that very

25  clearly.  Yes -- yes, that was her defense, I totally get that.

1   But she chose to go on the stand and tell that lie.

2         The jury has spoken, the jury has said, that's not

3   true, beyond a reasonable doubt, that is not true.  Because one

4   of the elements of the crime is, that she had to come in to

5   Pennsylvania with the intent to sexually exploit a child and she

6   said, the exact opposite.

7         So, I think, once again, the facts show, she did not

8   tell the truth on that point, the jury confirmed that she did

9   not tell the truth on that point.  And the cases make it clear

10  that lying like that, is a reason to find that she obstructed

11  justice or misrepresented herself to the Court.

12        The second issue, which is even more concrete, I would

13  argue, is that she testified at the trial, that she never went

14  back to the park.  So, to put that argument into some

15  perspective, if your Honor recalls from the trial, the morning

16  that she was supposed to meet with the victim, she met with him

17  at the park that morning.  The victim had to go meet with his

18  parents for lunch, so he did that and the expectation was, when

19  lunch was over, he was going to go back to the park.

20        Her testimony was, she saw him, realized, essentially,

21  what she was doing was wrong, never went back to the park that

22  day, that was her testimony, she never went back to the

23  afternoon to meet the child.

24        But as your Honor is aware from the trial, we have

25  both her text messages as well as her cell-site data that

1  completely belie that point.  Her testimony was, I believe, she

2  went to some festival or something and then, eventually, made

3  her way back to home.

4        So, what we know from the text messages that were

5  presented at trial is, that -- here is one at 3:31 p.m. -- she's

6  saying:

7        She's about to leave, so you're sure about not seeing

8    me?

9        Now, the victim's parents already knew what was going

10  on, so the victim is not responding at this point.

11        At 3:55, she said:

12        Okay.  I waited some more and no reply.  I feel so,

13    so very stupid.

14        At 3:29, she said:

15        I've waited long enough for empty promises.

16        And what we know during this time, is that when she is

17  sending these text messages, her phone is hitting in the same

18  park she met the victim in that morning.  So, the trial evidence

19  conclusively puts her in that park at that time, where she said,

20  she was not.  That is a complete perjured statement.

21        Your Honor, again, I don't think it gets any more

22  clear than that, she was there, her text messages prove it, she

23  wasn't on her way home at that point in time, she was sitting in

24  the park waiting for the victim, telling him, she feels stupid

25  and where is he?

1     So, your Honor, I think on those two things, the law

2   is very clear, if she perjures herself, then the obstruction

3   enhancement must apply.  If you find that that's what she did at

4   trial, then, the two-level enhancement is appropriate.

5     And then once again, your Honor, just because she is

6   the defendant, it does not give her the right to misrepresent

7   herself or lie to the jury or to this Court.  So, I'd ask the

8   Court to apply the enhancement.

9     THE COURT:  All right, thank you.

10    I am going to overrule both objections.

11    As to the enhancement under Section 2G1.3B2A for

12  misrepresentation, the defendant was able to unlawfully, entice

13  the minor victim to engage in illicit sexual conduct by lying to

14  the minor about her own age and parental status.

15    The defendant knowing that the minor victim was only

16  fourteen years old, led him to believe that she was twenty-five

17  years old, when in fact, she was thirty-eight years of age.

18    The defendant also misrepresented to the minor victim,

19  that she did not have children, despite the fact that she had

20  three children.

21    After the police were contacted, the minor victim was

22  reluctant to speak with the police about the details of his

23  contacts with the defendant, but clearly expressed that he was

24  upset about the defendant's misrepresentation as to her age and

25  lack of children.

1    Accordingly, the defendant's misrepresentations were

2  central to the enticement and the -- the two-level enhancement

3  is appropriate here.

4    Second, as to the enhancement under Section 3C1.1 for

5  obstruction of justice, the Court is of the view that, this was

6  properly applied, because the defendant provided the jury with

7  materially-false testimony, that she never intended to engage in

8  sexual activity with the minor victim.

9    When questioned about the extremely graphic and sexual

10  messages she sent to the minor victim, both before traveling to

11  and while in Pennsylvania, the defendant testified that she was

12  only playing.  The number and content of these messages refute

13  this.

14    Further, by convicting the defendant of Count 2, the

15  jury necessarily rejected the defendant's testimony on this

16  material issue.

17    Contrary to the defense's suggestion that the

18  enhancements punish the defendant for maintaining her innocence

19  and electing to proceed to trial, she did not merely hold the

20  Government to its burden of proof, but rather, she specifically

21  denied under oath, any intent to entice the minor victim or to

22  travel to engage in sexual conduct.

23    So, we are going to overrule both objections.

24    Mr. Glassman, I just want to make sure you have a full

25  opportunity to present any other objections that you may have,

1  in light of your meeting with your client today, any other

2  objections?

3          MR. GLASSMAN:  No, sir.

4          THE COURT:  All right, thank you.

5          Having reviewed the report, I adopt and credit the

6  presentence report, the factual findings and the guideline

7  calculations.

8          The defendant's total offense level is 34, her

9  criminal history score is zero, which results in a criminal

10  history category of I.  This combination produces a guideline

11  range of 151 to 188 months of imprisonment, a term of five years

12  to a lifetime of supervised release, a fine range of $35,000.00

13  to $250,000.00.  There is a $5,000.00 JVTA assessment and a

14  mandatory special assessment of $200.00.

15          Any objections to the calculations?

16          MS. STEPHAN:  No, your Honor.

17          MR. GLASSMAN:  No, your Honor.

18          THE COURT:  After calculating the guidelines, I am

19  required to consider the relevant factors set out by Congress at

20  Title 18 United States Code, Section 3553(a) and to ensure that

21  I impose a sentence that is sufficient but not greater than

22  necessary to comply with the purposes of sentencing.

23          These purposes include the need for the sentence to

24  reflect the seriousness of the crime, to promote respect for the

25  law and to provide just punishment for the offense.

1    The sentence should also deter criminal conduct,

2  protect the public from future crime by the defendant and

3  promote rehabilitation.

4    In addition to the guidelines and policy statements, I

5  am required to consider the nature and circumstances of the

6  offense, the history and characteristics of the defendant, the

7  need to avoid unwarranted sentence disparities among similarly-

8  situated defendants and the types of sentences available.

9    Mr. Glassman, do you wish to present any argument

10  about the factors in 3553(a) or otherwise, make a sentencing

11  recommendation on behalf of the defendant?

12    MR. GLASSMAN:  Yes, Judge, if I -- if I may.

13    My remarks are going to cover both issues under <u>Booker</u>

14  as well as what we are looking at here in terms of a mandatory

15  minimum sentence.

16    I want to make sure that the Court is aware, a good

17  deal of effort was put in to the pretrial phase of this matter.

18    As a matter of fact, I think, every effort was

19  exercised to avoid being here today before you with an

20  individual, who had no prior criminal history.

21    As a matter of fact, we were against a very tough

22  United States Attorney and there was communications to prior --

23  former -- counsel, with regard to a potential resolution.  We

24  were able to --

25    MS. STEPHAN:  If I could just object, briefly, your

1    Honor, if you don't mind me making a statement?

2        Technically, plea negotiations before trial or before

3    sentencing, are not the -- the privy of the Court, those would

4    go on between counsel and are not to be considered by the Court

5    at any point in time.

6        So, the fact that there were plea discussions, should

7    have no relevance and they are not appropriate for argument

8    here.

9        THE COURT:  All right, Mr. Glassman, what is your

10   response --

11       MR. GLASSMAN:  If I may, your Honor.

12       THE COURT:  -- to that observation?

13       MR. GLASSMAN:  The -- the purpose, I -- the purpose of

14   the argument, isn't to put any plea negotiations or anything

15   substantive with regard to that particular issue.  The purpose

16   of the argument is to communicate what the defendant's, again,

17   state of mind had been throughout her representation, that

18   culminated in the trial.

19       It wasn't as if, the defendant wasn't presented with

20   options.  It wasn't as if, she had a -- a lot of time to consult

21   with counsel about the fact that she is facing a horrific

22   mandatory minimum sentence.

23       So, I wanted to make sure that the Court was aware of

24   the fact as well -- in sentencing Ms. Norton -- that this was --

25   the trial was the product of a well thought out and a well

1    discussed and well evaluated conclusion on her part, maintaining

2    her reality, which is, essentially -- as I repeated earlier --

3    that she did not travel across state lines to have sex with the

4    minor.

5         So, that was the only purpose, I didn't want your

6    Honor to get the impression that we -- we just showed up, just

7    attended one or two conferences and then, elected to put the

8    case on the trial list.  That -- that both sides were presented

9    to her and made available to her before the case, actually, was

10   set down for trial and -- and proceeded to trial.  And that was

11   -- that was all I was trying to put forth.

12        In other words, the strength of her conviction,

13   overrode the pretrial phase of this case and -- and culminated

14   in the trial, so, hopefully, that's satisfactory.

15        THE COURT:  All right, any objection to those remarks,

16   Ms. Stephan?

17        MS. STEPHAN:  No, your Honor.

18        THE COURT:  All right.

19        MR. GLASSMAN:  Right.

20        Now, as I said, an -- an individual can choose,

21   either, practicing civil law, business law, criminal law, a lot

22   of decisions in making a decision to go to criminal law, it's

23   because we like things black and white or as close to black and

24   white as possible.  And then if, in fact, you need some

25   highlights here or there, they serve a particular purpose.

1     Here, things didn't exactly work out in -- in a black

2 and white fashion.  And what I mean by that is, right now -- in

3 under an hour -- I am sitting next to an individual, who is

4 facing, I would say, on the best of all possible days, a

5 mandatory minimum sentence of -- of ten years in jail.

6     And in doing so, I just would ask the Court to

7 consider, what the facts are, that she is being sentenced to

8 that term of imprisonment for.

9     And again, putting it in the context of where we are

10 today in society, as -- as I said, I have a person with no prior

11 criminal history, who engaged in a sexually-explicit series of

12 conversations with -- with a minor, during an, otherwise,

13 permissible gaming relationship through the course of playing

14 with different individuals on the Internet.

15     This -- these conversations contained

16 misrepresentations, as the Court stated to both age and her

17 status as to whether or not, she had any child -- children.

18     There was an agreement to meet between these two

19 individuals and that meeting occurred across -- across state

20 lines.

21     They met and where did they meet?  They met in a

22 public park in a public setting.  What did they do, they talked

23 for a little over or under an hour.  Both left their separate

24 ways.  There wasn't an agreement between the two to meet up

25 later on that day and certain -- and that did not occur.

1      I believe, Ms. Norton attempted to contact the

2  individual, perhaps, by phone, but that did not materialize, it

3  wasn't successful.  Ms. Norton returned to the area later on

4  that day, again, that was -- there was nothing further after

5  that, there was no meeting between the two individuals.  And Ms.

6  Norton then, left, she crossed state lines and went back.  No

7  further contact between Ms. Norton and this individual.

8      Those are, essentially, the facts.

9      Now, we could -- we could read the sexually-explicit

10  conversations and talk about how bad it is.  We can understand

11  the fact, that having these kind of conversations with a minor

12  could have extraordinary, profound, long-lasting psychological

13  effects.

14      We could talk about the fact, that she took advantage

15  of the minor.  We could talk about the fact, that she

16  misrepresented to a minor.  There is a lot of things, that we

17  can talk about.  And these are also, facts, they -- they can't

18  be disputed.

19      But the core facts of what we're dealing with here, it

20  is not an individual, who had sex with a minor, once or over the

21  course of a longer term.  It -- there is nothing here that

22  suggests in any way, shape or form, that that was going to occur

23  beyond the body of the text exchanges that we have.

24      As a matter of fact, the other evidence that the Court

25  was -- that the jury was presented with -- was that it wasn't

1  gonna occur, obviously, in a park open to the public in -- in

2  mid-day.

3        So, in essence, when we'd look at the facts and we'd

4  look at the extraordinary sentence, that Ms. Norton is facing

5  now, the question would arise as, one, is it a sentence that

6  covers the concerns of <u>Booker</u>?  All right, in other -- and your

7  Honor highlighted some of those -- some of those in determining

8  what -- what particular sentence to fashion.

9        And, certainly, at the end of the day with a sentence

10 like this, Ms. Norton isn't a risk to reoccur, there is nothing

11 here.

12       With a sentence of ten years, there isn't a risk that

13 that society in hearing these facts, isn't going to be alarmed

14 or concerned that Ms. Norton didn't pay a legitimate, acceptable

15 price for her -- for her behavior.

16       In other words, if we use the <u>Booker</u> analysis to these

17 facts and I would respectfully submit that these facts would not

18 protest, a -- a mandatory minimum sentence for -- for Ms.

19 Norton.

20       Certainly, when we'd look at the facts -- as I'm sure,

21 ah, the U.S. Attorney is going to bring up -- we can extrapolate

22 for a reason to enhance the sentence, behind the mandatory

23 minimum, perhaps, the number of the text exchanges, the fact

24 that she did misrepresent her age, things like that, we could

25 use that.

1     But is that process legitimate, when we're looking at

2     a sentence that is ten years -- ten years in a prison for

3     somebody, who did not have a sexual relations with the minor,

4     for someone, who did not meet the minor more than once, for

5     someone -- as I said -- who has no prior criminal history and

6     based on the totality of the facts that were put forth for the

7     -- before the jury?

8     That's the question that the Court -- that I would

9     ask, that the Court consider.  And consider it, not on a surface

10    level, but consider it in terms of a deep analysis of what a

11    sentence is supposed to achieve.

12    Now, you know, the frightening thing about cases,

13    like, child pornography, sexual assault, cases that involve

14    minors, there is a threshold that the law considered when --

15    when evaluating what the penalties would be.  And then there is

16    the societal impact and what they determined the penalties

17    should be.

18    And here, above and beyond, the mere time that Ms.

19    Norton is going to spend in -- in a -- I don't know -- a six-

20    foot something cell for a minimum of ten years.  If you'd just

21    consider that, the fallout or the other baggage that a

22    conviction that she's gonna carry for the rest of her life, is

23    going to have on her ability to -- for employment opportunities,

24    her ability for social opportunities, across the board, it's a

25    social death sentence.

1       So, we have a sentence of a mandatory minimum and

2    then, we have a social death sentence.  We have that on one side

3    of the scale.  And then, we have the facts of the case on the

4    other.

5       The other important issue, that -- that again, going

6    back to the pretrial phase of this matter -- ah, sort of

7    strengthens, the effort that I put forward on Ms. -- Ms.

8    Norton's behalf is, I do a lot of state -- state work, including

9    different states.  And you see that the laws and the different

10    impacts that those laws have on different fact patterns across

11    the way.

12       And when you read <u>Booker</u> and -- and you -- you read

13    that phrase, that one of the concerns the courts are supposed to

14    have is consistency.  In other words, if you go here, you can

15    expect, this is gonna happen with these facts.  And if you go

16    over here, you can expect that pretty much, the same thing is

17    gonna happen.

18       I cannot in good conscience say, that I agree that the

19    sentence that Ms. Norton is facing now and the circumstances

20    that are across different states with these similar types of

21    fact patterns, are in any way in alignment, they're not in

22    alignment, factually.  They're not in alignment for a potential

23    sentence.  They're not in alignment with evaluation by

24    prosecutors or courts.  There is no alignment, whatsoever.

25       As a matter of fact, it's worse than that, because

1     sitting next to Ms. Norton faced with these charges, faced with

2     this sentence, faced with these facts, I can't look her in the

3     eye and say, that there's people in other situations in other

4     courts within a five hundred mile radius, that are facing the

5     repercussions and the sentence that she is facing based on these

6     facts.  It just -- you can't do it, no matter how hard you'd

7     try.

8         Now, I'm not -- it's not to say, it's higher or lower

9     or the facts -- what it is to say is, that invariably, the

10     conduct is much, much worse and the sentences are much, much

11     lighter, than what Ms. Norton is remotely facing.  Even if your

12     Honor elected to downward depart, it would still -- that

13     statement would still be true.

14         And that, in and of itself, makes it very difficult

15     when you used the phrase, effective assistance of counsel,

16     because, you know, a counsel in talking to a client, has to make

17     a credible argument for why they should do a certain thing, you

18     see?  And here, looking at the sentence that Ms. Norton is

19     facing overall, it made those conversations, much, much more

20     difficult.

21         Less than forty-five minutes ago, in talking to Ms.

22     Norton, she related to me, that she's in a cell with, obviously,

23     state prisoners, who are sitting right next to her, that are

24     facing mere months in prison for actually engaging in sex with a

25     minor.

1    Ms. Norton makes that statement to me, a lot of times

2 when criminal defendants say something to their attorneys, we're

3 -- we're very good at discounting it, because they're charged

4 with crimes.  And obviously, you can't believe everything that

5 they say.

6    Here, I -- I can't in good conscience in any way doubt

7 the veracity of Ms. Norton's statement in any way, shape or

8 form.

9    That's not an issue that your Honor can really do

10 anything about, but it is -- it is to say, that when we'd look

11 at the facts and when we'd look at the statutes that she's

12 facing and we'd walk outside and we hit the streets and we'd

13 interact with the public at large, on balance are all of the

14 interests of the criminal justice system served by a sentence,

15 anything more than the minimum mandatory?

16    I can't do anything about the minimum mandatory, all I

17 could have done is, I made sure Ms. Norton understood what was

18 going to happen and realized that it was her decision going

19 forward, if she wanted to proceed to trial and to make that in a

20 knowing and intelligent way.  I can assure your Honor, that that

21 requirement was -- was fulfilled, there is no question about

22 that, it's her decision.

23    And as I said, this case began, continued and ended on

24 the same statement and that is that, Ms. Norton maintains that

25 she did not travel across state lines to engage in sex with this

1   minor.

2        And that's the real -- her reality and she is the one

3   that's responsible for it.  She has to now, pay the price for

4   it.  It isn't my function to take away her reality, only to let

5   her know what the -- what the ramifications were for her in

6   having it.  Thank you.

7        THE COURT:  Well, the defendant has a right to make a

8   statement and also, the right to present any -- any witnesses.

9        Mr. Glassman, are there any witnesses, you'd like to

10  present?

11       MR. GLASSMAN:  Judge, as you can see, there's

12  individuals from Ms. Norton's family in the courtroom.

13       And I will note for the record, I am ninety-nine

14  percent certain, that none of these individuals -- or maybe, one

15  -- was present during any portion of the trial.

16       I -- I just wrote that, because Ms. Norton went

17  through a trial where she -- she hid from her family, what was

18  going on and then, all of the sudden, after the conviction, I

19  started to get calls from -- from shocked -- shocked

20  individuals.

21       I asked them, wanted to address the Court, they

22  indicated that most have written letters to your Honor, that

23  what was expressed in the letters was sufficient.

24       So, no, we don't have any -- anything to present.

25       THE COURT:  All right.

1    Ms. Norton, you have the right to make a statement on

2  your own behalf, if you would like to, you are not required to

3  do so, but you may, if you would like.

4    Would you like to say, something on your behalf?

5    THE DEFENDANT:  Ah, I would.

6    THE COURT:  Go ahead.

7    THE DEFENDANT:  Ah, obviously, you know, I've been --

8  ah -- in the -- the county jail for over a year now.  Ah, it's a

9  -- a hard reality, ah, in there.

10    Ah, you find yourself, I don't know how else to say

11  it, it's -- you don't find yourself sitting by yourself in a

12  cell by, you know, twenty-four hours a day, it's -- it's a lot.

13    Ah, but I feel like, the judgment that's cast upon me,

14  that I wish it would be individualized and not to be, just in to

15  this great, wide variety of all these sex crimes and just put me

16  in there.  And not look at, what was done, my state of mind,

17  what happened after, you know, how -- how -- how bad was the

18  damage, that I -- that I caused.

19    And in this instance, I, like, I'm just thrown in a

20  category with a whole bunch of different things.  And I would

21  just like to be looked at individually, like, I told my lawyer

22  earlier, it's hard to accept the fact that I'm sitting in the

23  same state, in the same jail, in the same cell with people, that

24  had consensual sex with minors.

25    People that, you know, sold kids, ah, people that have

1  done child pornography, ah, people that even ran somebody over

2  with a car.

3      And I just, like, it's just hard for me to think that,

4  I could have did anything and received a less sentence.  I could

5  have got in my car, drunk and killed him.  I could have shot him

6  in the leg, I could have did -- and really hurt him and I would

7  have received, like, a less sentence.

8      So, I just -- I don't under -- you know, really, get

9  how so -- ah, based on what I did and what other people have

10  done, I just -- I don't understand the -- the drastic different

11  years of sentencing that is occurring.  I just -- it's -- it's

12  hard for me to fathom.  And, ah, I just wish that, I could be

13  looked at, individually.

14      I said from the beginning, that I was on a mental

15  breakdown for about six weeks, six weeks of my life, it was a

16  spiral down.  I can't express it, how many times, like, I was so

17  out of my mind, I was inflicting self-harm, pulling my hair out,

18  cutting myself, I tried to commit suicide.  All of this within

19  six weeks and me having these conversations with the minor.

20      Like, I was not mentally sound and I just -- I just

21  wanted you to consider that, because I didn't just wake up one

22  day and decide any of this.  Like, I really -- I would just like

23  you to consider that.  Because there's -- I was not mentally

24  sound.  I became -- I wouldn't talk to people, I ignored my

25  friends.  I wouldn't go to social gatherings.

1          I really, hated -- hated my life, I hated that I was

2     putting everybody through stuff, always being sick, working to

3     go to the hospital, from the hospital to work.

4          And doing that for two years, straight, I had a mental

5     breakdown after two years of doing that for six weeks of my life

6     and the six weeks of my life, is the most terrible time and now,

7     I am facing ten years in jail.

8          And I -- I just would like to be looked at

9     differently, than, ah, just thrown in as -- for a normal

10    predator or whatever it is, that goes on.

11         I wasn't looking for anything, I wasn't profiling,

12    searching people's profile pictures, I weren't going on

13    websites, I weren't looking at pictures.  I wasn't looking to

14    get into anything, it just occurred and I allowed it to happen.

15         And I would just like you to -- to take that into

16    consideration.

17         THE COURT:  All right.

18         Mr. Glassman, anything else from the defense?

19         MR. GLASSMAN:  Ah, no, your Honor, that's all, thank

20    you.

21         THE COURT:  All right.

22         Let's turn to the Government, Ms. Stephan, do you want

23    to advance any arguments about the factors in 3553(a) or

24    otherwise, make a sentencing recommendation?

25         MS. STEPHAN:  Yes, your Honor, thank you.

1    First, I want to start off by -- I think -- correcting

2    or highlighting some facts, based upon the defense presentation.

3    The one thing that I think keeps coming up over and

4    over and over again, obviously, is that she had no sexual

5    intent, that was not part of this, she denies it to this day,

6    that she did not go back to the park that afternoon.

7    Again, as I already mentioned in my argument as far as

8    the objections to the PSR, we already know that she went back to

9    the park, a fact that they continue to represent, did not

10   happen.

11   We know it as fact, we know it from her texts, we know

12   it from the GPS records, she went back to the park, they

13   continue to put that forward.

14   Also, we know from the trial testimony, that she asked

15   for a late checkout, that shows or it demonstrates that she

16   wasn't leaving right away.  We have -- we presented the hotel

17   records at trial to show, she asked and paid extra for a late

18   checkout.  Once again, I think that bodes with, she wasn't

19   leaving town, she was planning on staying.

20   And they -- they make a point of always saying, no sex

21   occurred, thank goodness, no sex occurred.

22   But, one, she's not convicted of having sex with a

23   minor.  She is here today to face punishment for enticing a

24   minor and traveling across state lines with the intent to have

25   sex with the minor.

1     What we know is, but for the defendant's father

2     finding out about, what was going on, that minor child,

3     probably, would have gone back to the park that afternoon.  It

4     was only because his father thought, things seemed strange and

5     checked his phone that he found out, what was going on and

6     forbid his son to go back.

7     Once again, your Honor, we know that she was waiting

8     in the park for him and texting him, where are you?  I feel so

9     stupid.

10     So, the fact that no sex occurred, takes nothing away

11     from the fact that that is exactly what she intended, that's

12     exactly what she wanted and but for a father being attentive, it

13     probably would have occurred.  But once again, your Honor,

14     that's not why she's being sentenced.

15     The other argument they make is to comparing the

16     sentence to state-court sentences.  I'd submit to your Honor,

17     that has no relevance here.

18     I would point out, that we could look at this a little

19     bit differently, that whatever the sentence -- sentencing

20     guidelines differ from the state guidelines, it doesn't mean the

21     federal sentencing guidelines are wrong, it doesn't mean, the

22     punishment is wrong.

23     If you'd want to accept the fact, that state sentences

24     are lower, maybe, the focus should be, they are wrong, child

25     predators should get big sentences, they should have to go to a

1    jail for a long time, they are dangerous to children, they are

2    dangerous to our community.  So, saying her sentence is

3    different, maybe, the state needs to take a look at what they're

4    doing, not take a look at what we're doing.

5          Because, once again, your Honor, it is paramount that

6    punishment happens, deterrence happens and protection of the

7    community happens here and that's why these crimes are

8    considered very serious.

9          When the defendant talked, she talked about, while she

10    was in jail, you know, she found herself, you know, she has a

11    lot of time to do that.  The one thing that was crystal-clear,

12    she did not yet find her way to the truth, that is crystal-

13    clear.  She still maintains her innocence, sitting here today as

14    a convicted person.

15          That also shows, she has zero remorse for her actions.

16    If she can't admitted that she did any wrong, how can she have

17    remorse for not doing anything wrong?  And again, that doesn't

18    bode well for her in my opinion.

19          She is begging to be looked at as an individual.  I'd

20    say, let's do that.  My whole argument is looking at her as an

21    individual.  What an -- she uses the word, predator, like,

22    somehow, she's not part of that group of people in jail, who are

23    predators, who are getting less time than she is.

24          I think, she needs a wake-up call, she is a predator,

25    that's what she did, she preyed on a fourteen-year-old boy, that

1    is the definition of predator, what she did.

2         So, I want to examine each of them, we know that she

3    came across state lines to sexually abuse a boy.  We know that

4    she sent sexually-explicit messages to that boy over a period of

5    time.  If that's not egregious enough, I want to point to

6    several facts that make it a much more egregious crime.

7         So, we already know from the presentation here today

8    as well that, at first, she started off this relationship with

9    deception.  She said, she was a twenty-five-year-old woman with

10   no kids, not in a relationship and presented herself, sort of

11   as, you know, a -- kind of a girlfriend figure, there was a lot

12   of flirtation going back and forth.

13        As I said earlier in my presentation today, had she

14   not said she was a twenty-five-year-old woman, we may not be

15   sitting here today.  I'm not so sure, if the victim would have

16   continued to talk to a thirty-eight-year-old woman with three

17   kids, two of which were as old or older than he was.

18        Second, in targeting the child, she routinely wanted

19   to make sure, she didn't get caught.  Again, as the trial

20   evidence pointed out, she made several statements to him about

21   him sneaking away from the parents, making sure, the parents

22   didn't know.  Some exact statements are:

23        So, if I come out there, any issues with me

24      stealing you away, I don't want to get you in trouble.

25        And honestly, do you have any -- do you have parental

1       supervision wherever you go?

2           And, again, I'd point out at the times of her crime,

3   her own son was fourteen years old, the same age as the victim

4   in this case.  As a mother, you would think that she would know,

5   the kind of harm that she was causing to a boy, the same age as

6   her own child.

7           But her only concern, your Honor, was making sure that

8   the boy didn't get caught, so she didn't get caught, that was

9   her focus.  That is not the mind of a caring mother, your Honor,

10  that's the mind of a predator.

11          Third, she toyed with him and she played mind games

12  with him, this was all throughout her communications, it was

13  almost, like, a cat toying with a mouse.  She kind of would roll

14  him in, drag him in and then, push him away a little bit and

15  then, bring him in again and then, push him away a little again.

16          These were adult mind games she was playing with a

17  fourteen-year-old boy, who was no match for her, he was a naive,

18  inexperienced teenaged boy, who hadn't had any kind of adult

19  life relationship in his life, nor should he have.  And she

20  changed all of that -- independently, she changed all of that.

21          And she played these mind games with him.  She would

22  tell him:

23          I'm kind of disappointed with you, I wanted to see

24          you, I told you before, I knew -- I knew you were fucking

25          with my head and I chose to listen to you, again, fool me,

1    once.  So, really, fuck you, Sam.

2    Another one was:

3    I don't know, I was gonna drive eight hours to visit

4    you and you're acting like, you can't be bothered.  I'm

5    tired of throwing myself at you, there's only so much

6    rejection, I can take from one person.

7    There was also a series of communications in which she

8    almost seems to be throwing a little bit of a hissy fit, that

9    she thinks that he might have a girlfriend in school his same

10   age.  Almost, like, she was suspecting he was cheating on her,

11   that was sort of the nature and the tone of the communications,

12   that were presented at trial.

13   She also said:

14   I never, ever threw myself at anybody and you're

15   tossing me to the side, I can't do it, it's really ironic

16   how you actually, show enthusiasm after the fact.

17   Another statement was:

18   So, why bullshit me earlier about wanting to see me.

19   Once again, this is all the psychological manipulation

20   with a boy, who was no match for her.

21   Third, the nature of the communications are -- are

22   nothing short of shocking.  I mean, you heard them all.  I am

23   going to repeat them here today, because I think -- some of them

24   -- because I think, they're worthy of repeating.  I think, it

25   sets in the mind, who this woman was communicating with a

1    fourteen-year-old boy and obviously, what her clear intent was.

2         One of her statements was:

3         Just try to forgive me, after I get done with you,

4         especially, the first time we do it, 'cause I'm sexually

5         frustrated, 'cause of you and you're a virgin and I'm

6         gonna tear that dick up.

7         She also said:

8         I tried to tell you, I was dead serious, my pussy,

9         physically, hurts because I want -- I want you inside

10        me that bad, it's horrible for me.

11        She also says:

12        I like teasing you during my peak hours.

13        So, your Honor, these communications, well, we have no

14   other interpretation, none whatsoever.  This is why she

15   traveled, this is what the jury found and these were sexually

16   explicit.

17        If you recall from the trial testimony, she also

18   talked about a pillow, that she named after him, her Sam pillow,

19   that she would hug at night and pretend it was him.

20        I mean, once again, your Honor, these are things, she

21   is saying to a fourteen-year-old boy, this raises the crime,

22   this makes it more egregious.

23        Fourth, she also mentioned -- which was not part of

24   her -- her argument today -- but it was part of the trial

25   testimony or, at least, what she was trying to get across at

1    trial.  It was that, she wanted to help Sam, that he had some

2    challenge in his -- in his life and she was just there to help.

3           And, your Honor, once again, that is almost laughable,

4    the problems that this boy had in his life, were directly caused

5    by her -- by her actions.

6           Sure, this boy came with his own troubles.  You couple

7    that with the fact, that he's a teenaged boy and all teenaged

8    boys have their own issues in life.

9           But she took that situation and she made it worse,

10   nothing about what she did with a fourteen-year-old boy made his

11   life better, nothing.  And again, as a mother, your Honor, she

12   should have known better.

13          It is also worthy to point out, that this went on over

14   a period of time, this wasn't, you know, over a day, over an

15   hour or over even a couple of days, this went on for a period of

16   time, at any point in time, she could have stopped.  At any

17   point in time, she could have said, oh, my gosh, what am I

18   doing, I'm a mom, I should know better, she didn't.

19          What the trial evidence showed, is that her crime only

20   escalated, her texts only escalated, her level of manipulation

21   with this child escalated.  At any point in time, she could have

22   realized what she was doing was wrong.

23          This is almost not like one crime, every time, she

24   sent a sexually-charged message, every time she -- you know --

25   sent some kind of enticing text, it's almost like a separate

1  crime over and over and over again.  She had the opportunity to

2  stop at any point in time and she didn't do so.

3      Your Honor, she points out that she was having some

4  kind of mental breakdown or was not mentally sound.  She had

5  some challenges in her life, had her medical conditions, that's

6  all well and good.

7      But I think, you can say that about a lot of people, a

8  lot of people have medical challenges, a lot of people have

9  trouble struggling mentally, it doesn't cause them to target a

10 sexually -- target a fourteen-year-old boy sexually.  It doesn't

11 cause them to travel across state lines to have sexual contact

12 with a minor.  It doesn't cause them to play mind games with a

13 fourteen-year-old boy, none of that is justification.

14     Except, all of that is true, but it does not release

15 her from any liability for what she has done and once again,

16 your Honor, she continues to fail to really appreciate that

17 fact.

18     Now, Sam's father wanted to come today and he was

19 prepared to come to some of the prior hearing dates, but

20 unfortunately, he had to work, so he couldn't be here.  But he

21 did send a letter.

22     And I think, what the letter indicates is that, Sam

23 has never been the same, he has never been the same kid as

24 before Ms. Norton came into his life and that is the cold

25 realty.  She has refused to admit, she did anything to cause

1    this boy -- boy any kind of problems.

2          In her statement today, there was not one shred of an

3    inkling of remorse or acknowledgment for what she has done to

4    family.

5          So, the bottom line, your Honor, is she aggressively

6    targeted this fourteen-year-old boy, her behavior was predatory,

7    it was narcissistic, it was manipulative.

8          We can never truly fully appreciate the harm that it's

9    caused to the fourteen-year-old boy, but what we know very

10   clearly is that she has single-handedly changed that child's

11   life and changed that family's life and his scars will last a

12   lifetime.

13         And for all of these reasons, your Honor, I think she

14   deserves the high end of the guideline sentence.  Thank you.

15         THE COURT:  All right, thank you.

16         I am prepared to pronounce and impose the sentence.

17         Pursuant to the Sentencing Reform Act of 1984 and

18   after assessing the particular facts of this case in light of

19   the Section 3553(a) factors, it is the judgment of this Court,

20   that the defendant is sentenced to one hundred and sixty-eight

21   months of imprisonment on each of Counts 1 and 2, such terms to

22   run concurrently.

23         As to the nature and circumstances of the offense, the

24   defendant's sexually-explicit communications with the minor --

25   the victim -- occurred over several months.

1     The defendant misrepresented her age and the fact that

2     she did not have children in order to entice the minor victim to

3     engage in illicit sexual conduct.  The defendant's chats, e-

4     mails and text messages grew increasingly explicit over time.

5     When the minor victim did not respond as the defendant

6     wanted, she got angry at him.

7     The defendant, who has three children of her own, one

8     several years older than the minor victim and one,

9     approximately, the same age, should have known how damaging her

10     conduct would be to a fourteen-year-old boy.

11     The letter from the minor victim's father, who was

12     also, himself, impacted by the defendant's crimes, has explained

13     in detail, the negative behavioral changes in the minor victim,

14     both at home and in school that resulted from the defendant's

15     conduct.

16     The minor victim talked about suicide and running

17     away.  The minor victim was put on medication and was diagnosed

18     with certain medical conditions.  Despite counseling and the

19     passage of time, the minor victim's father remains concerned

20     about his son's safety.

21     Even now, the defendant fails to recognize the

22     seriousness of her conduct and has refused to fully accept

23     responsibility for her actions.

24     As to the history and characteristics of the

25     defendant, the defendant has no convictions or arrests.  She has

1    the support of family and friends, a number of whom are here

2    today.  And also as witnessed in the various letters that have

3    been presented to me.

4         I have considered that the defendant has a kidney

5    disorder and the pain she experiences as a result.

6         The Court has also considered, the types of sentences

7    available and the need to avoid unwarranted sentencing

8    disparities among similarly-situated defendants.

9         For all of these reasons, the Court finds that, a

10   sentence in the middle of the guidelines is appropriate.

11        The defendant's request for a variance is denied.

12        The Court finds that the sentence is sufficient, but

13   not greater than necessary to deter criminal conduct, to protect

14   the public from further crimes of the defendant, to reflect the

15   seriousness of the offense, to promote respect for the law and

16   to provide just punishment.

17        The Court finds the defendant does not have the

18   ability to pay a fine and, therefore, there would be no fine in

19   this case.

20        Considering that the defendant can work while

21   incarcerated and again, after her release as well as her

22   education and work history, the Court finds that the defendant

23   has the ability to pay a JVTA assessment over the length of her

24   sentence.  It is ordered that the defendant shall pay the JVTA

25   assessment in the amount of $5,000.00.

1    It is recommended that the defendant participate in

2    the Bureau of Prisons' Inmate Financial Responsibility Program

3    and provide a minimum payment of $25.00 per quarter towards the

4    assessment.

5    It is ordered that the defendant shall pay to the

6    United States, a special assessment of $200.00, which shall be

7    due immediately.

8    Upon release from imprisonment, the defendant shall be

9    placed on twenty years of supervised release on each of Counts 1

10   and 2 to run concurrently.

11   Within seventy-two hours of release from the custody

12   of the Bureau of Prisons, the defendant shall report to the U.S.

13   Probation office in the district to which the defendant is

14   released.

15   While on supervised release, the defendant is subject

16   to the following standard conditions -- I have to read these to

17   you now, but you are going to get a printed list of these later

18   on:

19   First, she shall not commit and other federal, state

20   or local crime.  Shall be prohibited from possessing a firearm

21   or other dangerous device.  Shall not possess an illegal

22   controlled substance and shall comply with the other standard

23   conditions that have been adopted by this Court.

24   Second, the defendant must submit to one drug test

25   within fifteen days of the commencement of the supervised

1   release and at least, two tests thereafter as determined by the

2   Probation officer.

3        Third, the defendant shall submit to the collection of

4   a DNA sample at the direction of the Probation officer, pursuant

5   to Section 3 of the DNA Analysis Backlog Elimination Act of

6   2000.

7        In addition, the defendant shall comply with the

8   following special conditions:

9        First, the defendant shall participate in a mental-

10   health program for evaluation and/or treatment and abide by the

11   rules of any such program until satisfactorily discharged.

12        Second, the defendant shall participate in a sex-

13   offender evaluation and/or treatment and abide by the rules of

14   any such program until satisfactorily discharged.

15        Third, the defendant shall register with the state sex

16   offender registration agency in any state where she resides, is

17   employed, carries on a vocation or is a student as directed by

18   the Probation officer.

19        Fourth, the defendant shall report to the U.S.

20   Probation office any regular contact with children of either sex

21   under the age of eighteen.  And the defendant shall not obtain

22   employment or perform volunteer work, which includes regular

23   contact with children under the age of eighteen.

24        Fifth, the defendant shall submit to an initial

25   inspection by the U.S. Probation office and to any examinations

1    during supervision of the defendant's computer and any devices,

2    programs or applications.  The defendant shall allow the

3    installation of the hardware or software systems which monitor

4    or filter computer use.

5    The defendant shall abide by the standard conditions

6    of computer monitoring and filtering that will be approved by

7    the Court.

8    The defendant is to pay the cost of the computer

9    monitoring, not to exceed the monthly contractual rate in

10    accordance with the Probation officer's discretion.

11    Sixth, the defendant shall provide the U.S. Probation

12    office with a full disclosure of -- of her financial records to

13    include yearly income tax returns upon the request of the U.S.

14    Probation office.  The defendant shall cooperate with the

15    Probation officer in the investigation of her financial dealings

16    and shall provide truthful monthly statements of her income.

17    Seventh, the defendant is prohibited from incurring

18    any new credit charges or opening additional lines of credit

19    without the approval of the Probation officer, unless she is in

20    compliance with the payment schedule for the JVTA assessment.

21    The defendant shall not encumber or liquidate any

22    interest in any asset, unless it is in the direct service of the

23    JVTA obligation or otherwise, has the expressed approval of the

24    Court.

25    Eighth, the defendant shall satisfy any amount still

1  owing on the JVTA assessment in monthly installments of not less

2  than fifty dollars to commence thirty days after release from

3  confinement.

4       Ninth, the defendant shall notify the U.S. Attorney

5  for this district within thirty days of any change of mailing

6  address or residence that occurs while any portion of the

7  assessment remains unpaid.

8       Ms. Norton, as to your appeal rights, you have the

9  right to appeal your conviction and the right to appeal your

10  sentence.  Any notice of appeal, must be filed within fourteen

11  days of the entry of judgment or within fourteen days of the

12  filing of a notice of appeal by the Government.

13       If requested, the Clerk will prepare and file a notice

14  of appeal on your behalf.  If you cannot afford to pay the cost

15  of an appeal or for appellate counsel, you have the right to

16  apply for leave to appeal *in forma pauperis*.  If approved,

17  counsel will be appointed for you and you will not be required

18  to pay any costs.

19       The defendant is remanded to the custody of the United

20  States Marshals.

21       Before we adjourn, is there anything else to come

22  before the Court on this matter?

23       MS. STEPHAN:  And, your Honor, just for the purposes

24  of the appellate record, I am assuming that the defendant's

25  arguments that she had health problems and claimed mental-health

1   issues was considered in rendering your opinion and your

2   sentence?

3           THE COURT:  It was --

4           MS. STEPHAN:  Thank you, your Honor.

5           THE COURT:  -- yes.

6           MR. GLASSMAN:  Judge, I would simply ask that -- the

7   family has mentioned, the location of where she's going to be

8   incarcerated or at least, for now, be as close to the --

9   Connecticut -- or the town in Connecticut as humanly possible?

10          THE COURT:  Any objection?

11          MS. STEPHAN:  No, your Honor.

12          THE COURT:  All right.

13          I'll make that recommendation.

14          MR. GLASSMAN:  Thank you -- that you very much.

15          THE COURT:  As you know, I can't require it, I can

16  only recommend it.

17          MR. GLASSMAN:  Sure, I understand, absolutely.

18          THE COURT:  All right.

19          MR. GLASSMAN:  Thank you.

20          THE COURT:  Anything else before we adjourn?

21          MS. STEPHAN:  No, your Honor.

22          THE COURT:  All right, Mr. Wood --

23          MR. GLASSMAN:  I did want to thank your staff, ah --

24          THE COURT:  Pardon?

25          MR. GLASSMAN:  -- I wanted to thank your staff, this

1  case was scheduled for -- I -- I don't even know how many times

2  and they've always been very gracious to my office and

3  accommodated any questions that we had.  And I just wanted to

4  say, it was really a great experience, thank you.

5         THE COURT:  Thank you.  All right.

6         Mr. Wood, would you adjourn court, please?

7         DEPUTY CLERK: Yes, sir.

8         Court is adjourned.

9         (Adjourned in this matter at 3:17 p.m.)

10                                    *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

<u>C E R T I F I C A T E</u>

I, a court-appointed transcriber, certify

that the foregoing is a correct transcript from the

electronic-sound recording of the proceeding in the above-

entitled matter.




Date: <u>March 14, 2021</u>

Gail Drummond
28 8th Avenue
Haddon Heights, New Jersey  08035
(856) 546-6270